We can give a minute for the next set of lawyers to come up in United States v. Teman, 21-1920. All right. Now, I understand, Mr. Quainton, whenever you're all situated, just make sure you tilt the microphone down so that we can hit you all. Can I just ask the courtroom deputy, could we just move there's sort of a folder right there. Would you mind moving that out of the way? Thank you. Mr. Quainton, I understand you would like to reserve two minutes for rebuttal. Is that right? Yes, Your Honor. Okay. And I think we can all hear you very clearly. So whenever you're ready, you may proceed. Thank you, Your Honor. I may please the court. My name is Eden Quainton, and I represent the appellant, R.A. Teman. Mr. Teman was convicted of two counts of bank fraud and two counts of wire fraud. And we submit there are four separate reasons why the conviction should be vacated. And those are lack of venue, constructive amendment, ineffective assistance. And we also raise a range of issues on due process, which I won't go into because there are just too many, I think, in the limited time we have. But I would like to talk about one, which is the need for a special verdict in this case. So first, there was no venue in the Southern District in this case. This case should have been brought in Florida. My client, Mr. Teman, is a Florida resident. His company, GateGuard, which is a startup tech company that manufactures and installs smart intercoms, is based in Florida. It's operated out of Florida. Well, counsel, venue is obviously not sort of a predominant. It's not one of these things that's determined by, like, where venue is most convenient or something. It's not a form of convenience. So why don't you just focus on the purported absence, I understand, in your view, of any New York venue? Because, obviously, if there's enough venue in New York, that ends it. It doesn't matter whether there are lots of contacts in Florida. I understand. The reason I stress the Florida is one logical question. It may very well have been that your client could have been indicted in Florida. Many crimes could be indicted in multiple venues. Just why don't you focus on why, in your view, New York was not a proper venue? Yes, Your Honor. So to do that, what I'd like to do is just go over the facts very, very briefly. There were two transactions, one that occurred in April of 2019, one that occurred in March of 2019. That second transaction involved the deposit of 27 checks into a bank in Florida. Of those 27 checks, 24 of those checks were drawn on the account of J.P. Morgan. And there is no evidence anywhere in the record that there are any contacts with J.P. Morgan in New York. The J.P. Morgan accounts on which those checks were drawn, those are maintained in Ohio. That's in the record. Any review that was done of those checks was done in Texas. So if you want to look at the record, A1661 shows you that the accounts for those 24 checks were maintained in Ohio. And A1770 shows you that the- There were no, the indictment did not specify crimes check by check. That's correct. It was done on the basis of a scheme. That's correct. And would you agree that if there's any venue with regard to any check pertaining to the scheme, either wire fraud or bank fraud, that that can be shown to be New York, that that would satisfy venue? Leaving aside the issue on a special verdict, I would agree, Judge Walker. So I just want to make sure that we understand exactly what we're talking about because the record is very unclear. So of the 27 checks deposited in Florida on April 19th, 24 of them have nothing to do with New York. Why don't we talk about the other three, though, because I think that's what they're resting venue on, which is the IP address, right? No. The IP address is the two checks in March. So I'll get to that. I thought you were talking about March. I'm talking about April. I'm sorry. You're talking about April. I'm sorry. The bulk of this case is the April deposits. Eighty-three percent of the checks, 93 percent of the dollar value, 100 percent of loss all relates to those April checks. That's what I'm focusing on. Okay. So for the April checks, I understand the government's resting on the venue being the fraud review by Signature Bank in Manhattan, right? Okay. And would you agree? Well, let me just ask you, is that the issue we're talking about? Because if I'm confusing March and April, please let me know. Is that what we're focusing on for the moment? Yes. And then could you just – just so we have some common ground to proceed from, do you agree that if it was reasonably foreseeable to your client that those fraudulent checks would be processed or subject to the fraud review in Signature Bank in Manhattan that there would be venue here? Do you agree with that proposition or no? Well, if it were reasonably foreseeable that a fraud review would occur before the crime was complete, I would agree with you. The issue here – I see. Venue is related to the subject of the crime. So you're making a different argument, not that it was not foreseeable that the fraud review would happen in Manhattan. You're arguing that the crime was complete before the fraud review, and therefore the fraud review is not part of the crime. That's simply something that happened afterwards. That is correct. Okay. And with respect to the 24 checks, it's not even an issue with respect to the three checks. Right. I think to really understand why – So why don't you talk about those three and why you think the fraud review is something that's necessarily something that's completely subsequent to the crime. Okay. So bank fraud either occurs on the view that we take when the check is presented to the bank on deposit. And that's a U.S.C. – that's a position that's been taken by many courts around the country. But even on a more expansive view, which the government is probably going to rely on, which is Utiliano, which says bank fraud is complete when the funds are received. On either of those two counts, any fraud review that occurred occurred after the funds were received. So what happened with those three checks was that on April 19th, the 27 were deposited. They were subject to a seven-day hold. The three checks were never cashed in Manhattan because in March, which had occurred a month before, those accounts had been closed. So the three checks for $33,000 were never cashed. What happened as a bookkeeping matter was Mr. Tiemann's account was initially credited on April 19th. But he never got those funds because there was a hold on the account. And then on April 24th, before he got the funds, that was reversed because the account had been closed. The fraud review for those – quote-unquote fraud review – didn't occur because what happens in this unimpeached testimony on A790 by Mr. Motto, who says fraud review occurs when the customer's account has been debited. The customer's accounts for the three April checks at issue were never debited because those accounts had been closed. What happened was after Mr. Tiemann received – after the transaction was reversed, there was a – those checks were looked at, but there was not a fraud review because the account had already been closed. The government is making an argument that because of what happened in March, it was foreseeable that there would be a fraud review in April. And therefore, that – whatever the shenanigans of the defendant's – of your client's concern, that he had to take into account the possibility of a – a fraud review was foreseeable, and he had to take into account that and handle the transaction in a way to avoid it, to avoid being exposed. Justice Walker, not before the crime is completed. It's really important to remember the crime here is completed at the latest when my client gets the funds. The unimpeached testimony in the case is that any quote-unquote fraud review occurs in every single case after the funds have already been released to my client. Or in the case of those three April checks, there was never any release of the funds at all because the accounts had been closed. So it's impossible for there to be anything in New York that was foreseeable because the fraud review occurs after the checks were actually in my client's possession. I think we'll explain this, and this is set forth very well in Professor Frayer's opinion, which is at – I think it's 2233 of the record, and I think it's paragraph 31. And he explains that recent changes to the Treasury regulations provide that if you deposit an RCC with a deposit bank, that bank, if it accepts it, then warrants to every subsequent bank in the chain that it's a good check. It's a warranty from one bank to the other. So they don't need to do a pre-actual fraud review. They've got this warranty. If you look at the record, what you see is Bank of America lists the vast majority of these checks as RCC warranty breach, not a counterfeit, RCC warranty breach, because what they're saying is we said there was a – we warranted these good checks, and something happened subsequently that reversed that. But the crime of bank fraud was complete. So I guess I'm a little confused about the chronology. And if you could walk us through the chronology, and then we'll ask the government to do the same, about when this fraud review happened, because it had been my impression, and maybe I won't be wrong, that Signature Bank's Oasis team in Manhattan reviewed the checks for irregularity, flagged them, and then decided to reverse the withdrawals from the accounts. Is that not what happened with some of the April checks? That is not what happened with none of the April checks. So I think the best way to understand this is with the March checks, which is what the government kind of – Well, actually, if you don't mind, maybe you can circle back to the March checks, because it's hard for me to keep all the facts right in my own brain. Just for the April checks, what's, in your view, the chronology of events? So the chronology of events for the April checks is on April 19th, 27 checks are deposited in a branch of Bank of America in Miami, Florida. Twenty-four of those checks are not subject to any fraud review at all that's in the record. Three of those checks are determined to be presented to an account that's been closed. So the check – it's not a fraud review. It's just that the account – Okay, so three of the checks are determined by whom to have been drawn on an account that is closed. So that would be in the bank-to-bank process. And it's a little bit unclear from the record exactly how the bank-to-bank process works, because all the emphasis is on the fraud review. And fraud review, as I say, occurs after an account has been debited. And that's unmistakable in the record. And Mr. Motto – And these three checks that you're talking about are from which corporate accounts? So these are from the – this is the 508 – this is 214 – sorry, the 508, West 214. These are the Coney Realty checks that were – I thought we were – Sorry, is it 508, 214? Yes, Your Honor. The LLC is – and forgive me if I've got – Take your time. Take your time if you want to prompt your memory. I believe it was 518 West 204th Street, LLC, which was managed by Coney Realty and – which was testified to by a man named Eli Gabay. So we can call them the Gabay checks. It's probably the easiest way to think of them. I'm confused because I thought the government was relying on the West 204 and 18 Mercer corporate accounts for purposes of the signature bank fraud review. Am I mixing up – Yes, you are. With respect – sorry, Your Honor. The 18 Mercer, that is that 18 Mercer. So there's 18 Mercer equity, which has 18 Mercer, and that's managed by Crystal Real Estate Management. The Gabay checks are not the 18 Mercer checks. So the 18 Mercer check – there's only one 18 Mercer check, and that check was returned for insufficient funds. So that check is actually not relevant. When that check was presented, there weren't enough funds for it. The Gabay checks, the West 204 checks that Mr. Gabay was responsible for, those are the three that are at issue in April. Okay, so the West 204 checks. Correct. And are they going through Signature Bank? Those are drawn at Signature Bank, correct. Okay, so the West 204 checks. Tell me what happened to those in terms of the chronology for April 2019. Okay, so – Those are drawn on Signature Bank. Right, in Miami. They're drawn on Signature – no, they're drawn on Signature Bank in New York. Right, but deposited in Miami. Yeah, they're deposited in Miami. Okay, so we're down to these. And how many of the West 204 checks are we talking about in April 2019? Three checks.  One for $18,000, one for $10,000, one for $5,000. Okay, so let's focus on those. Okay. In your view, what does the evidence show, the chronology of events for the West 204 checks? So during the period, the hold was placed on those checks. Actually, let's just back up a second. I beg your indulgence on this. April 19th, those three checks are in the batch that are deposited in Miami. Yes, Your Honor. Okay, that's April 19th. Yes. They're deposited in Miami. Okay, what's the next step in the chronology for those three checks? So the next step in the chronology is a hold is placed on those checks. By? By Bank of America. Okay, BOA places a hold. Do we have a date or no? What's that? Do we have a date? Yes, on April 19th. Okay. So BOA places a hold immediately on the checks when they're deposited and keeps the hold for seven days. During the pendency of that hold on April 24th, before there's a fraud review, the checks are presented, but there's no—the account has been closed in New York. When you say the checks are presented, are you saying Bank of America presents the checks to Signature? There's a bank-to-bank process that's not— Between those two banks. Yes, between Bank of America and Signature. That bank-to-bank process could occur in jurisdictions we don't know about, in terms of the inner workings of the banking system. It's not really gone into detail on the record. But the checks are, in some fashion, presented against the Signature account. That account is closed. So the checks—the checks are bounced back. A fraud review can't occur because the fraud review only occurs if the client's account is actually debited. So you're saying the fraud—there was no fraud review ever— Correct. —ever occurred with respect to these three checks? Correct. Correct. That is actually what happened. There may be confusing testimony on that, but it's absolutely crystal clear from the record that the fraud review is only triggered or only happens after an account has been debited. And again, let me just direct your attention to A790 of the record, where Mr. Motto makes that clear. There are other places as well where that's clear. But if an account has been closed, there's no fraud review. So we argue in the papers that it wasn't reasonably foreseeable that a fraud review would occur in New York. That's true. It wasn't reasonably foreseeable because who knows where the fraud review occurred. Fraud review could have occurred outside of New York. But I don't—I think to really understand the critical issue here is there was no fraud review. And moreover, those three checks, which were never actually my client's use and possession of the actual funds, those three checks were included in the forfeiture amount. So if you take the forfeiture amount of $333,000, that included those $33,000 that my client never touched. So I think that proves that even on the government's own theory of the case, the crime must have been completed on deposit because otherwise—must have been completed on deposit. Because otherwise, how could you possibly include the $33,000 that my client never actually received? So I guess I'm just looking at some of the testimony here. I'm looking at page—around 821 of the appendix. And it seemed to me that there was testimony here. I guess this is from Mr. Motto or Ms. Motto, whoever Motto is, at Signature Bank, going through the records. And on 822, it says fraudulent item account closed. There was a notation. And it looked like there was a notation made by someone whose—the testimony indicates it's on the fraud team, Oasis. I understand that's the fraud review team. Yep. And that person had made an indication in the record, fraudulent item account closed. Now, whether the fraud is, for whatever, review—I mean, the fact is if it's being reviewed by the team in New York and they're determining that the nature of the fraud is a closed account or the nature of the fraud is whatever, doesn't it indicate that the rejection, the account closed, was happening by the fraud team that was— I don't think that's necessarily what happened. You're saying that this is an after-the-fact notation, that they're looking at some already rejected dead transaction and that their review couldn't sort of revive the failed crime. That's correct, Your Honor. Because when they say fraudulent check account closed, the check wasn't rejected because it was fraudulent. The check didn't—wasn't—was rejected because the account was closed. And I would just read to you this language that I keep on harping on, which is just shortly after or before the language you're talking about. And this is where Mr. Amato says, so let's say somebody—this is Mr. Batia asking him— let's say somebody deposits a check in another bank, but it's drawing money from a signature bank customer account. How does Signature first hear about that check? Answer, actually the client's account is debited. When the client's account is debited is when we hear about it. So that fraud team is alerted when the client's account is debited. I think you're absolutely right, Your Honor, as to what happened, is there was an ex post notation about this check. They had determined that a previous check in March was fraudulent based on the review in March. But this check was not subject to a fraud review. So this is just going to the question of venue just based on counts 1 and 3. If the crime is complete and there are no contacts in New York, we cannot have venue for counts 1 and 3. And that's really, really important in this case because all of this case is really about counts 1 and 3, all of the money, all of the harm, all of the loss. 100% of it relates to the money the Bank of America lost as a result of those 24 checks, which totaled $264,000 and the restitution amount that was sought was $259,000. The delta is because there's a little bit of money in the account. And let me just back up then a second. When the check is bounced, the April 2019 West 204 check, let's call it bouncing because the account is closed, it's bouncing against Signature Bank of New York, right? Right. So how is the bouncing itself not venue in New York? Because that means something has been presented, whether electronically or somebody walking in with a check in the old way, to a bank in New York saying pay up, the bank in New York, Signature Bank, saying no dice, the account is closed. Even if you're right that the sort of fraud review doesn't happen until after the bouncing and therefore the crime is complete, why wouldn't the bouncing and the refusal of the check or the presentation of the check to the depository institution in New York itself be evidence of venue in New York? I think we get into Williams territory. Just presenting a check is not bank fraud. I mean, what's bank fraud is – Well, it's a necessary part of making your bank fraud scheme play out. Right, but it's impossible. I think in terms of perhaps as an attempted bank fraud, we could have – but the attempt is complete when the last substantial step for the completion of the crime has been completed. The substantial step analysis would say that was when he deposited those checks in Miami. Yet maybe he intended to defraud the bank. But he couldn't defraud the bank because it was – the account had been closed. It was impossible. Well, he defrauded Bank of America, right? He did. That's where he deposited it. And why would that not be part of the scheme to think, well, he really wanted the money. He didn't really – he wasn't hoping against hope that the money was going to come out of Bank of America's pocket. He was hoping that it was probably going to come from the deposit account that he was writing a check against, right? It just so happened that when the music stopped, Bank of America was left holding the bag, and they were the victims here. But isn't that part of the ongoing scheme? I would submit that when you just present a check against a closed account, that's not bank fraud. But let me take a different tactic. But one question here, and this ties into this point that's being made, I think, is that this is a scheme, and the indictment talks about executing and attempting to execute a scheme and the deposits of which were assured, et cetera, et cetera. And then it said he deposited counterfeit checks. And that's what the indictment charges. And then at that point, it seems to me if you've got a scheme, it doesn't really – does it really matter what happens after that as long as there's some – there's got to be some connection to New York in the operational scheme, I guess, or the contemplation scheme. But the actual checks don't really matter. Except as they may show, it's like a conspiracy and you have an overt act. And the overt act is in New York, but nothing else is. And you have a situation here where you have a scheme and you have checks written in furtherance of the scheme, and if there's an overt act in New York of some point or an action in furtherance of the scheme in New York, then there's venue. Well, let's just imagine we had a universe in which the only thing at issue were those three checks. Yeah. And we had this – it's all three – everything else, just those three checks. And we know that my client never actually received any funds, right, because the accounts have been closed. So what – but he is nonetheless convicted and he's ordered to pay restitution, he's ordered to pay forfeiture on the basis of those checks for which he never received a penalty. We would have to conclude on those facts that the crime was completed when he deposited the check because – Why? That doesn't follow to me. I get it that you're saying in the end he didn't wind up with any money, but if I am trying to defraud you, bank, your bank, and I hand you a bum check, my crime is not complete when I hand it to you. Let's say you go talk to another bank and they talk to another bank and they talk to another bank and they're all trying to make the transaction work. That crime, that fraud crime keeps going, right, through all those reasonably perceivable acts. Now, if in the end somebody catches on and says, wait a minute, this is a bad check. Nobody paid this guy any money. I'm still guilty of bank fraud, even though I didn't get any money. And all of those intervening acts are still part of the fraud. I guess I don't understand why, because he didn't, in your view, get any of that money, why somehow the crime ends earlier than it otherwise would have. Well, I'd like to move on to reasonable forcibility, but just to try to tackle your question, Judge Nardini, the bank fraud could be complete on one of two dates. Either on a restrictive view, and this is Krinsky, it's a Second Circuit case, when you present the check. And the logic behind that in this case would be the nature of RCCs. Once you've deceived the first bank successfully, they warrant every other bank down the chain that it's a good check. So that's the real key moment. But Rutiliano says the bank is complete when you receive the funds. If you don't receive the funds- But complete can mean one of two things. Complete can mean it's over, and anything that happens subsequent to that date is no longer a crime. The other way we use the word when a crime is complete is when all the elements are now present. So if I kidnap somebody, the moment I kidnap someone, it's complete and I can be prosecuted for it. But it is an ongoing violation, and I can still be prosecuted, and the statute of limitations runs, and everything I still do while I keep the person in my custody remains part of the crime. Now, bank fraud and kidnapping don't line up exactly, but I think that complete can mean two different things. One is as soon as you present that check, he's committed the crime of bank fraud and can be prosecuted. But the things that keep happening that are reasonably foreseeable in order to make it happen are still part of the crime. So I don't see that presenting the check as rendering it complete means the crime is over. It just means that now he's stuck. He committed a crime. The crime would be complete on the theory that upon deposit it's complete. But let's turn, if we could, to the reasonable foreseeability, because that gets us back to March. And I think it is important to understand what happened in March. So in March there were two checks that were deposited via mobile deposit. One was for 18—actually, each of them was for $18,000. And so the way, as your honors know, I'm sure, when you do a mobile deposit, you take out your mobile phone, you scan a check, you click send, take a picture. And in this case, the funds were immediately credited to my client's account. That happened on March 28th. And the record shows that Bank of America maintained internal records that the IP address for that transaction was New York, New York. There's a lot of, I think, noise about whether New York, New York means Manhattan. I don't think that's the real issue. I think the real issue is what flows from the IP address being New York, New York. And this court and the prosecution, more importantly, the government here, has taken a position in U.S. v. Kidd in the area of warrantless obtaining of IP address information that there is no connection, no necessary connection between an IP address and location. Well, I don't think we can take a position as a matter of law about what IP addresses mean. The question is what the evidentiary record shows, right? I would agree with that 100%, Your Honor. That's a very technical question. I think we would both agree with that. So the only question is whether one could make a reasonable inference, drawing all inferences in favor of the verdict here, whether it would be a permissible inference to say that the testimony saying that it was a New York IP address meant that it was physically located in New York, right? Right. So we would need, for that to work, we would need some competent evidence from some person with knowledge about how IP addresses really work. And some person with knowledge could have been presented and could have said, yes, this IP address most likely means New York. The person who was presented was a records custodian. There was no evidence given that she had any competence whatsoever about IP addresses, that she knew anything about technology, that that IP address was even the IP address. It was the IP address of the… If someone testified that I got a call from an area 212 number, let's say a records custodian at a bank, and said that's a New York number, it seems to me your argument would be the same to say, well, unless I had somebody from the phone company, that's not competent evidence. How is my scenario different from yours, except for the fact that I guess you're arguing, what, I don't know what you're arguing, how would that be different? It's different because internet IP addresses are extremely technical. I think the… I don't know how area codes work. I mean, I literally don't. But I think a person of a lay witness of, you know, ordinary intelligence would be able to infer that if it's a 212 landline number, then… How do they know it's a landline? Well, then I would agree with you. If it's a… So if the person is calling from a cell phone, my cell phone is a 202 number, right, because I have a cell phone from Washington, D.C. I call you on a 202 number, and a custodian says, I think that's a New York number. That's not competent evidence of anything, right? That's exactly what happened here. There's an IP address linked to New York, but we have no way of knowing whether that IP address… And there's no… And in your view, I understand you can't draw no permissible inference about what that means. You can literally draw no inference. It literally means… Probably a little longer. Can I just ask you one brief question, because I know you've reserved some time. We want to then hear from the government. Let me just ask you a procedural question about your ineffective assistance claim. Yes. Sometimes we resolve these things on direct appeal. Our general preference is usually to defer them to resolution on a 2255. But a lot of that depends on whether the issue has been fully developed. In your view, is this… Is there a need for further factual development on this, or is this a claim that you think is properly resolved by our court on appeal? I think it's properly resolved by this court on appeal, Judge Rodino. Okay. And for the reasons set forth in your brief, I just want to clarify that sort of procedural question. Do you want to add one quick clarification? One quick point. When it's beyond doubt, and the interests of justice so require, that's the standard under Allitt and Matos. It's beyond doubt here, because if you look at the record, and this is towards… And that's on the prejudice prong. Or the performance prong. I mean, obviously, you have to satisfy both. Your view is that it is unquestionably resolvable on both prongs. Yeah. And I would just direct your attention to Judge Engelmeyer's comments towards the very end of this whole case, not when he's actually making his ruling on ineffective assistance, during sentencing. He sort of… I was going to say let his hair down, but I don't know if that's… I haven't met him, so… But he sort of lets you know what he really thinks. And when he says what he really thinks, and this is at 2446, he says, presenting the communications of R.A. O'Reilly, thinking they support an advice of counsel and defense, is so inaccurate, so incorrect, so unpersuasive, as to be delirious. Those are not the comments of an advocate. Those are the comments of the judge looking at the performance of this case. And I think… But he also found no ineffective assistance, right? So we also understand. Okay. Unless there are any further questions right now from members of the panel? No. Well, I guess just one follow-up. So you're… In terms of the question of not hearing from counsel at all, and sort of whether or not this could be some kind of strategy, your view is that's just not an issue here at all, that it's so egregious that we don't need to hear from counsel? Yes, Justice Lee. I think that's exactly right, is that it's so clear. I mean, Your Honors and your clerks have probably been through these records more times than you like. I've gone through the record, you know, three times. Each time as I'm going through the record, I'm thinking as an advocate for my client, you know, he's got an argument here, he's got an argument here, he's got an argument here. When I get to the testimony of Arlo Reinitz, every single time I get there, this is on a cold record, this is not in the courtroom, cops, crime, police, the case is over. I mean, it was just the most catastrophically stupid blunder that any lawyer could ever possibly make, basically admitting evidence that your own lawyer is accusing you of wanting to commit a crime. Now, there are reasons why on the merits we don't think that actually the mens rea was still not satisfied, but I won't go into that. I just think when you – it was so fundamental, so obvious, there's really nothing that you could say to justify introducing evidence that destroys every possible – Well, unless the counterargument was that your client was in such deep trouble, you know, it's like when you're down six points and there's two seconds left in the football game. There's nothing left to do but throw a Hail Mary. It's the dumbest play in the world, but sometimes it's your only play, right? I mean, sometimes your low percentage shot is your only percentage shot. And I guess that's the question, is whether either that is evident on the record, I suppose, as the government may argue, or whether that's the sort of thing that one would query the defense lawyer who will say, look, I talked about – hypothetically, I talked about this with my client. We knew these things were going to come out. It was a calculated risk. It was a mighty risk. And I told him that, look, I don't see how we're getting out of this unless we lob one up in the air. I guess that's the question, is why would that not be appropriate? I think you could resolve it on the merits. I mean, at my hotel when I checked in, I checked in and I had to use the internet and the first thing it says is you accept the terms and conditions. I dumbly clicked on the terms and conditions without thinking about this case at all. And then I thought, wait a minute, I've got a terms and conditions case. So I went back and actually looked at what I was signing up to. It's pages and pages and pages of stuff. All of that is enforceable. So my client's position was I had an online contract evidenced by terms and conditions. When clients clicked on the terms and conditions, when they acknowledged they knew the terms and conditions, that had embedded payment terms that permitted me to deposit RCCs, they have constructive notice. All right, but obviously you're, all right, I think we understand the position. We have your benefit of the briefing and we'll be back to you for two minutes of rebuttal afterwards. Again, we thank you for your patience in keeping you up. Why don't we hear from, let's see, is it Mr. Batya? Mr. Batya, I think, I can't remember in this courtroom, but we should have a little button on the right that allows you to raise or lower the podium. There you go. And if you wouldn't mind just doing that and adjusting the microphone so that we can hear you clearly, that would be great. May it please the Court, my name is Kadar Batya, and I'm an Assistant United States Attorney in the U.S. Attorney's Office for the Southern District of New York. I represented the United States in the proceedings below, including at the trial. I want to address one threshold matter and then I'll get into an apparent factual disagreement here. Just as a threshold matter, we do believe there are more factual bases to support Venue than just the signature bank review. We've briefed them and they include the withdrawal from a bank account, from the friend or fraud bank account, and they also include communications with one of the victims here in Manhattan. But I want to – not the three that we've been talking about, but the other 24, that there's nothing from those checks that give you Venue. Your Honor, from those other 24 checks, so those were checks drawn on ABJ Properties' bank accounts. On those checks, we believe that there is Venue because of the withdrawal of some of that combined money at a location in Manhattan. And we also think before the deposit of those 24 checks – Withdrawal from where? From a bank – a withdrawal from Manhattan. Was it his account or his company's account? It was a company account. Well, wouldn't the crime be completed by the time that the checks go into the company account? Your Honor, I think Sendona is relevant there. In that case, the court held that even where a defendant effectively controlled the bank account, a withdrawal was still enough to continue the offense. So here I think it's similar. The defendant effectively controlled that account. Fair enough. But his withdrawal of those funds still matters. Well, since we don't agree with you on that, then I guess you're saying that the three checks would supply Venue for those counts, right? Well, even for those 24 checks, the defendant communicated with the victim before that victim purchased the devices. And so those communications from the defendant in Florida to the victim here in Manhattan also provides Venue over those counts. Was that part – the fraud wasn't occurring at that point. Was he just trying to sell the devices? Your Honor, well, I think it was a wire and furtherance of the offense is what it was. It was an act and furtherance of the offense. Well, it's sequential, but it's not causational. Follow me? You know, okay. Never mind. We won't get into that. No, here's one other follow-up question. Let's assume that the jury on its own found guilt but did so on the basis of the 24 checks and not the three checks. We don't know because there was no special verdict. But under those circumstances, there wouldn't be – if there had been a special verdict and the three checks that were – we've been talking about were determined, the jury didn't reach them, didn't have to. They just decided on the other ones. It's just that maybe it didn't decide on the three checks even without reaching the question. Would there be a man here? Your Honor, I want to address the special verdict part of this first. Well, it's a special verdict thing, but it's also a question of whether you can combine all of the checks and say because of the presumption of favor after a conviction on this that everything is construed in favor of the government. You can't construe in favor of the government convictions that may not have occurred. And you might have just had convictions on the basis of the 24 and not the three. And that's the – well, that's also the problem, the special verdict. But we can't – how do we infer necessarily that there was unanimity on every check? Well, Your Honor, first our position is that there doesn't have to be unanimity on the particular means of committing the offense. So we opposed actually even the unanimity instruction that the judge gave. We don't believe that the jury actually has to be unanimous on the particular means of the offense. Leave that aside then. Let's just focus on the fact of conviction. Understood, Your Honor. Even over our objection, the judge still gave that unanimity instruction. And the juries are, of course, presumed to follow the instructions of the judge. Here the judge gave a unanimity instruction saying that they had to be unanimous on the particular – on the particular entity – victim entity. And let's assume that they were unanimous on the 24 checks but not the three. They could find guilt on that basis. They could, Your Honor. And for the reasons we set forth in our briefing, we think that – Would there be venue? Your Honor, we think there would be. Both because of the communications beforehand that went further into the – So then you're relying on the 24 to – on the venue argument that you made a minute ago on the 24. Yes, that's right, Your Honor. The before act and then the afterwards withdrawal act. Does this trigger the doctrine – I can't remember. It's Griffin. I can't remember the name of the Supreme Court case. When you have different alternative factual basis for a conviction for which there are sufficient evidences to some of the possible basis and insufficient evidences to some of the possible basis, we will presume of necessity that the jury convicted based on the alternative that does have sufficient evidence. That's right. I don't recall an exact case citation, but if there's an adequate basis from which the jury could have found guilt or in here found by a preponderance that there's venue, the court should affirm it on the court's – So in other words, absent, as we are here, a special verdict form, if we are left to conclude that there's venue for some of the checks, not venue for other of the checks, let's say we reject your arguments with respect to everything except one set of checks or even one check, we would be obliged to affirm based on the sufficiency of the evidence with respect to one of those basis that would be adequate to support the conviction. Is that a fair characterization? That's right, Your Honor. Is that case in your brief? I'm generally familiar with that concept. Your Honor, I – I don't think it is. Your Honor, I believe we cited at least one case. We cited for the proposition that the court can affirm based on any basis in evidence, I guess even if the district court disagreed with it. That's a little different. That's a different proposition. That's a question. Here I'm distinguishing between like, for example, if you had multiple legal bases for a conviction, one of which say there was an erroneous instruction, then we would be getting into Yates' error, and then we would be having to evaluate some sort of a harmlessness analysis. But when we have multiple factual bases for a conviction, then we're in a different world. I think it's Griffin versus United States, but maybe I'm confusing it. Your Honor, an analogy – I don't know if that applies – I don't know if that only applies, that rule that I just articulated, only to the factual basis for guilt, for the elements of the offense, or whether that also has been applied to questions of venue, which, of course, don't go to guilt. They go to – But I would – My instinct here, I'm asking, and I'd be interested for other counsel, if that proposition that goes to the elements of offense and guilt also applies to venue. Well, Your Honor, an analogy comes to mind that I think comes up all the time in criminal cases. A defendant victimizes many people in many different jurisdictions. So there could be victims of, let's say, a security fraud or some other financial fraud in California, Texas, New York. The government might put on evidence that some of those victims were in New York. They might call one victim from California, one victim from Texas, one victim from New York. As long as the jury finds that there's venue for that victim in New York, that would be sufficient to prove the whole wire fraud scheme. Right. So I don't have a case for that, Your Honor, but I know it's a common practice to call victims from many jurisdictions. Yeah, even though there's a possibility that they didn't base the conviction on that particular transaction. Right. Could you address the issue that we spend a considerable amount of time with appellants' counsel on, which is the reasonable foreseeability of the fraud review by Signature Bank in New York and how that ties in to the timeline? I think appellants' argument is that no matter how you view it, that fraud review could not have happened except after, under any view of the facts, the crime was over, complete in the sense of not just ripe for prosecution, but just done, passed, over. This is simply an after-the-fact thing. I understand from the briefing the government takes a contrary position, but could you just walk us through at a little bit of a micro level how that works in your view? Yes, Your Honor. I'll go through the particular dates, and where I can, I'll provide you citations. So, on the first key date for those April transactions— And we're just talking, I'm sorry, to clarify the three checks in the April 2019 counts. Is that fair? The three checks in April 19 that went to Signature Bank. Right. Okay. Just want to make sure we're talking about the same checks. So, on April 19, 27 checks were deposited, including the three that were drawn on Signature Bank. And they were deposited in Miami, Bank of America. That's right. They were deposited in a Bank of America branch in Miami. Got it. There was a review conducted, let me, there was a seven-day hold placed on those. There was testimony by the Bank of America witness, Ms. Finnecaro, that on checks drawn from a different bank, there's a seven-day hold. Does that happen on April 19 as well? That happens on April 19. It happens when the checks are deposited. And that part about how they're drawn on a different bank becomes relevant later on. So, a seven-day hold is placed. There's both testimony and Government Exhibit 149, which is in the appendix, that refer to a review by Signature Bank on April 23, 2019. On April 23, 2019, Signature Bank conducts its review, where it identifies these checks as fraudulent for, among other things, one of the indicia of the fraud is that the bank account had already been closed. But that fraud review has to take place by Signature Bank. And that's where I reference the fact that it was drawn on a different bank. When a check is deposited at Bank of America from a Signature Bank account, Bank of America doesn't know anything about that check. It doesn't know if it's the right account holder. It doesn't know if that person has said, never withdraw, never, never draw a check from me again. It doesn't know if it's the right signature because it's a Signature Bank account. So it doesn't even know if the account has been closed. Because, of course, it's not a Bank of America account. It's drawn from Signature Bank. So this fraud review that took place on April 23 was essential to finding out whether this money would clear or not. The money was credited to the defendant, but it was held, but there was a hold on it. And that hold was so that this process could play out. I'm sorry, when you say it was credited to the defendant, you're talking about April 19th by Bank of America. On April 19th, and this is in Government Exhibit 113, which is an Excel, it's a large Excel file, so I think the court has it electronically. The money is at least nominally credited to the defendant's account. By Bank of America. By Bank of America. Okay. So can we just address what I think is the appellant's argument here, which is that there was testimony to the effect that the fraud review doesn't happen until after. I think he said the money is debited from the depository account. And since the account was closed, it couldn't have happened. So therefore, a fortiori, the fraud review must have happened after the check bounced. Is that, in your view, what's reflected by the evidence or no? That is not reflected in the evidence. So to be clear, respectfully, we think the defense is mixing different concepts here. But I can tell you about the evidence at trial and what's sort of supported by the record here and what we believe is, you know, in addition to all those things we think is, in fact, accurate, there had to be this review by Signature Bank because Bank of America cannot complete this transaction itself. A check was deposited at Bank of America, which drew funds from Signature Bank. So whether the account had been closed or canceled or any manner of things that had happened on the Signature Bank end, Bank of America wouldn't know that. So all Bank of America can do is sort of credit the account but put a hold on that money while this process plays out. It's true that the customer had closed that account after the March transactions, but that's exactly why the fraud review has to take place to find out, in this period of time, should the transaction be cleared, should Signature Bank honor this deposit or this withdrawal, or should Signature Bank what it did in this case, which is issue a chargeback and say whoever versus. So am I characterizing the government's position accurately when I say that, in your view, there's no evidence that sort of the check bounced and the transaction was sort of over and done with as something that was now dead before Signature Bank conducted its fraud review? There is no evidence of that, and there is evidence to the contrary, that the fraud review was part of why the transaction was later reversed after the fraud review. Okay. Can I ask you then to turn to one of the questions we asked to opposing counsel about ineffective assistance and whether this is something properly addressed by us on direct appeal or whether, as generally is the case, but not always, that it would be more properly addressed on 2255. I don't think that there was the typical proceeding where a defense lawyer was asked to explain. You know, if a defendant raises an ineffective assistance claim, it often necessarily waives the attorney-client privilege with respect to that strategic decision. And then you can hear from the defense lawyer, well, what was your thinking? How did you advise your client? Did you weigh the pluses and minuses? I suppose in a situation like this, you might ask the defense lawyer, did you know about these impeaching texts that were going to come in? So did you actually weigh the pros and cons? What's your view of the state of the record such that it would inform our decision whether or not this is the kind of claim we should resolve or whether it's more properly raised in the first instance with new counsel to represent the defendant before the district court? Yes, Your Honor. In the district court, there is next to no record on this. Prior to sentencing, Judge Engelmeyer had asked the parties actually to comment on or to brief whether they thought bail pending appeal was appropriate. I think that Judge Engelmeyer knew this was a question that would be coming to him. He asked the parties to address it. The defense gave little, little shrift to that advisement. They addressed it briefly, but they did not raise an effective assistance based on Mr. Reinitz's testimony. This was by now new counsel, which could have done that. New counsel could have commented on it. They didn't. They raised it orally after sentencing when the judge was deciding bail pending appeal, which is a common practice. And there they raised it. The judge, without the benefit of any briefing but with oral argument from the parties, said I'm going to deny the basis for an effective assistance, but I'm going to grant bail pending appeal on it. But for that reason, there is no record in the district court about this. There's no written briefing on it. The judge ruled, as is his right, orally after sentencing on it. But it really, aside from there being no even legal briefing on it or factual analysis and legal briefing, there isn't what Your Honor referenced, the important factual development of asking the defense lawyers who did the trial exactly what Your Honor referenced, which is an important part of deciding a case like this. It might be resolvable on its face. I think on its face it was a fair decision to make. But the next step would be if it's something less than an obviously fair practice, professional practice, then the next step would be to go talk to those lawyers, and that hasn't been done. Can I just ask you, when you say you think it could be a fair practice, do you not think that it was extraordinarily harmful to have these e-mails or texts come in? Your Honor, much of the defense that is even sort of the tenor of the defense even on this appeal is based on these RCCs, and they're based on this agreement that the parties purportedly, the victims might have clicked through. There was no evidence of that until the lawyer testified. So I would say the texts were certainly used to impeach some of his testimony. I think that's fair to say. Were they referenced during summation? They were. They were, Your Honor. But I think without the testimony from that lawyer, there's no evidence of these RCCs or the fact that there was this agreement that they went through. I don't think there are any further questions, so thank you. Why don't we hear from Mr. Quainton. You've got two minutes for rebuttal, and as we did with the last argument, because we kept you up both considerably past your time on the initial presentation of argument, why don't we try to hold it to the two minutes then? Thank you. I'll do my best, Your Honor. I'd like to make one point on foreseeability of the review, which I didn't get a chance to develop. The question with respect to those three checks in April was, was a fraud review in New York foreseeable? And the government says that the fraud review in New York was foreseeable because with respect to the March checks, there had been a fraud review in New York. But that's ex-post thinking from the perspective of the defendant, who has a constitutional right to be tried in the district where the crime was committed. He has no way of knowing where that fraud review is going to take place. And let's go back to the 24 checks. Those 24 checks are drawn against the account of ABJ-Milano and ABJ-Lenox, which are New York companies that have New York addresses on the checks. But those checks are reviewed in Texas, and that's in the record at A1770. Fraud review happens in Indonesia. It happens in the Philippines. You have no possible way of knowing, as the person to whom it has to be reasonably foreseeable, that it was New York. He deposited the checks. He got the money. Later, he was informed that there had been a problem. He had no possible way of knowing solely on the basis of the address in New York the fraud review would have occurred in New York because for the ABJ checks, it didn't. Briefly on Sedona and Villar. Those cases actually go against what the government is trying to make them stand for. Those cases say that until the defendant actually reaches, the defendant obtains the proceeds from a company that he controls, the crime is not complete. In this case, the defendant already had received all of the proceeds from the alleged crimes long before he attempted this withdrawal. It wasn't the case that the funds were sitting out there in some custodial account, and I think in Villar it was an SBIC account, and then it was transferred back to the defendant. He already had the funds, and he was just after that making a further withdrawal. As Judge Engelmeyer said, that could be money laundering. That could be some subsequent crime. It's not part of a completed crime because he's already received all of the funds. Secondly, the other alternative basis they have for venue are these communications with Soleimani. And I think Judge Engelmeyer was spot on here when he says, look, the government chose to indict very tightly around a series of events from March to June 2019. All of these communications with Soleimani occur in 2018 and long before the March 2019. So those can't support venue for subsequent actions. On the special verdict, I think Your Honor has raised a very good point. And I'm not aware of any case that says that if you have two discreet situations, one in which there is no venue, the 24 checks, and one in which there might be venue, the three checks, that you can convict when it's possible the jury thought that they were convicting on the basis of the 24 checks, for which there absolutely is no venue. There's no basis whatsoever for venue. The communications don't do it, and the subsequent withdrawal doesn't do it, and certainly the fraud doesn't do it because that didn't occur in New York, and the deposit didn't occur in New York. That argument wasn't made in your brief, was it? Which argument? The one that you just made. No, actually, you're right. I was taking it from a different angle. I was taking it, what if they had convicted solely on the basis of the three checks? That would be a travesty of justice because all the harm is in the 24 checks. Your Honor raised the flip side of that, and I think it's a well-taken point. It's the flip side of the coin. On venue, what if they had been convicted on the basis of the checks for which there was no venue? I'm not aware of a case that specifically says in that case you have to have a special verdict. I think special verdicts are unusual, but Orozco-Prada says when you can't tell what the jury was thinking, a special verdict is appropriate. There was a discussion, wasn't there, before it went to the jury about a special verdict between the court and counsel? So the way that happened was from the very beginning of the case, the judge raised the question of special verdicts or some kind of special interrogatory. He did it at A81. He did it at A149. He did it at A543, A662. He said things like this is a substantial question, but we need a special verdict. He said it's almost certainly something that would be fruitful to consider. Then he said in A662, on the assumption I'm going to do this, I'd like to have further thought about this. But there was no—he suddenly reversed his thinking just before Reinitz testified. And he said I'm not going to go to the right with a special verdict. So there was no affirmative waiver of the issue. And I think the key case to think about—this was not in the briefs, but I'd like to raise it. It's U.S. v. Danilovich, which is 731 FedEx at 45. It's a 2018 case. And that just clearly articulates the difference between a waiver and a forfeiture. And waiver, you know, under traditional common law principles, is that knowing intentional— You say I don't want it. Forfeiture is—it doesn't come up. Exactly. And we argue here that it's a forfeiture situation. It was not an affirmative case like in the yellow case that the government cites, too, where they said we don't want a special interrogatory, and then they changed their mind. That doesn't work. Here they were just silent. So I think you can reach it, and I think it's extremely prejudicial not to have required a special verdict. Both for the substantive reason that we discussed in the brief, and for the procedural reason that Your Honors have raised today. All right. Looks like we're out of questions, too, so we've kept you both quite long today. We thank you very much. We will take the case under advisement, but both the arguments were very helpful, so we thank you. With that, having taken all of our cases in the calendar under advisement, we will stand adjourned.